Acacia Investments, B.S.C.(C), Plaintiff,

against
West End Equity I, Ltd., WEST END EQUITY II, LTD., WEST END EQUITY III, LTD., WEST END EQUITY IV, LTD., WEST END EQUITY V, LTD., DCD AMERICA, INC., AION PARTNERS, LLC,AION REALTY, LLC,AION HOLDINGS, INC., SIRAJ DADABHOY, SHABIR RANDEREE, MICHAEL BETANCOURT, Defendant.


161709/2018

For Plaintiffs: Riker Danzig Scherer Hyland & Perretti
For Defendants AION Partners, AION Realty, and AION Holdings: DLA Piper US LLP, 1251 Avenue of the Americas, NY NY 10020
For Defendant Michael Betancourt: Meister Seelig & Fein, LLP, 125 Park Avenue, 7th Fl., NY NY 10017
For Defendants Siraj Dadabhoy and Shabir Randeree: Kasowitz Benson, Torres, LLP, 1633 Broadway, NY NY 10019


Andrew Borrok, J.

Upon the foregoing documents and for the reasons set forth on the record (2/13/2020), (i) the AION Defendants' (hereinafter defined) motion to dismiss (Mtn. Seq. No. 002) is granted solely with respect to the first (piercing the corporate veil) and fifth (accounting) causes of action, and (ii) Michael Bettencourt's motion to dismiss (Mtn. Seq. No. 003) and (iii) Siraj Dadabhoy and Shabir Randeree's motion to dismiss (Mtn. Seq. No. 004) are granted in their entirety and the complaint against these individual defendants is dismissed, without prejudice, for the reasons set forth herein. THE FACTS RELEVANT TO THE INSTANT MOTIONS
This is a judgment collection action alleging a complex fraudulent scheme by the defendants and seeking to pierce the corporate veil between (i) DCD America, Inc. (DCD) and West End Equity I, Ltd., West End Equity II, Ltd., West End Equity III, Ltd., West End Equity IV, Ltd., and West End Equity V, Ltd. (collectively, the West End Entities), and (ii) AION Partners, LLC (AION Partners), AION Realty, LLC (AION Realty), AION Holdings, Inc. (AION Holdings, and collectively with AION Partners and AION Realty as the AION Entities) and Siraj Dadabhoy, Shabir Randeree and Michael Betancourt.
In 2011, non-party TAIB Bank, B.S.C.(c) (TAIB) commenced an action against DCD and the West End Entities in New York State Supreme Court (DCD and the West End Entities, collectively, hereinafter, the State Court Defendants) (the TAIB Action) (Index No. 652669/2011). The Complaint alleges that the TAIB Action was based on a 2007 loan (the Loan) made by TAIB to the West End Entities for $17 million, which was secured by a guaranty (the Guaranty) of up to $10 million from the West End Entities' parent company, DCD. The Loan was part of a transaction for the purchase of two office buildings in Washington, D.C (the Transaction). The State Court Defendants had defaulted on the Loan in 2010. Acacia Investments, B.S.C.(c)'s (Acacia) wholly owned subsidiary, Acacia Real Estate Limited, also loaned the West End Entities $3.25 million as part of the Transaction, which it claims it never recovered.
Ultimately, following some protracted litigation, in 2016, TAIB prevailed and obtained (i) a judgment (the West Entities Judgment) against the West End Entities in the total sum $40,409,650, and (ii) a judgment (the DCD Judgment) against DCD for a total sum of $17,366,351, plus interest on both judgments running from December 19, 2016 (the West End Entities Judgment and the DCD Judgment, together, the Judgment). To date, the Judgment remains due and owning.
Over the next two years, TAIB sought to collect on the Judgment, serving over 20 subpoenas on the State Court Defendants, their former counsel, their employees and accountants, and on other related entities (O'Donnel Aff., ¶ 5). According to the Complaint, this post-judgment discovery revealed that DCD fraudulently transferred its assets in connection with a 2012 dissolution (Compl., ¶¶ 47-51). More specifically, the Complaint alleges that unbeknownst to TAIB and Acacia at the time, DCD began winding up its operations as early as 2009 — after the State Court Defendants defaulted on the Loan — and dissolved on December 31, 2012, four years before TAIB obtained its Judgment (id., 47). As referenced in the Complaint, Michael [*2]Betancourt, a director of both DCD and the AION Entities, testified that DCD decided to dissolve starting in 2009 because:
I think it's really a function of as I stated earlier, the profitability of DCD was purely, or largely dependent on the generation of promotes, or exit fees in the event that an investor made a return above a specific hurdle, as outlined in the joint venture agreement. It was clear to the group at that time that DCD really wasn't  the transactions as cited in this May 23rd, 2007 minutes from our staff meeting, a lot of these trades were busted. And it was  we used it as an opportunity to really rebrand, start anew. So I think that's really what led to DCD going away.
(Compl., ¶ 51).
However, and significantly, DCD allegedly never provided notice to TAIB that it was winding up. Rather, at the same time that they were winding up DCD, the defendants created the AION Entities to conduct the same business (Compl., ¶ 54). Most of DCD's employees began working at AION Partners in the same capacity as they had previously worked at DCD (id., ¶¶ 56-57). In addition, AION Partners took over DCD's office lease and continued to operate out of the same office, using the same phone and fax numbers as DCD (id., ¶ 58). DCD also transferred some of its contracts to the AION Entities as part of the dissolution (id., 61). Certain properties previously listed as being in DCD's "portfolio" in 2008 are currently listed on the AION Partner's website as being in the AION "portfolio" (id. ¶ 59). Property records allegedly confirm that five of these properties were purchased before AION Partners was formed and one of the five was actually sold in 2006, which Acacia maintains is a further indication that AION Partners treats DCD's assets as its own (id.). Acacia claims that the AION Entities never paid DCD for the business they assumed.
Acacia also claims that TAIB's asset discovery was thwarted due to its inability to obtain bank account and other financial information from the State Court Defendants that would have provided more insight into their assets and transfers of same because (i) such records were never retained and (ii) the defendants concealed information when specifically asked about them. For example, AION Realty CFO Nafis Khan, who had previously served as controller with DCD, testified that he was never instructed to retain DCD's financial records and does not know where they could be, notwithstanding the active litigation of the TAIB action during the time of DCD's dissolution (Compl., ¶69; Khan EBT, 49:21-50:9; 88:5-12; 89:12-18). AION's accountant, Nadem Hasan, who had previously worked for DCD, likewise claims that he was never told to retain any documents (Hasan EBT, p. 17:2-4). In fact, in response to TAIB's 2017 information subpoena, the State Court Defendants stated that they "are not aware of" any business assets being transferred by DCD since 2009 and that, "to the extent that DCD America may have transferred any business asset . . . it was not significant" (3/17/17 Responses, O'Donnell Affirm., Ex. 5, No. 12, NYSCEF Doc. No. 74). However, DCD's tax returns from 2010 and 2011 allegedly showed over $5 million in assets and $0 in assets by the end of 2012 (Compl., ¶ 124). DCD's 2012 balance statement also allegedly showed a net income of $2,063,293.13 in 2012. The Complaint alleges that DCD transferred all of those assets to either the AION Entities or the individual defendants in or around 2012 in an effort to thwart TAIB's collection efforts (id., ¶¶ 125-127). 
The Complaint asserts four causes of action for (1) piercing the corporate veil, (2) actual fraudulent conveyance, (3) constructive fraudulent conveyance, (4) director liability (i.e., against [*3]the individual defendants only), and (5) accounting.
Motion Seq. 002
In moving to dismiss the claims against them, the AION Entities argue that the Complaint fails to state a claim and because, per Acacia's own allegations as set forth in the Complaint, TAIB/Acacia had ample notice (or that, at least, they were on inquiry notice) of the transfers during the pendency of the TAIB action and, therefore, the claims are time barred. The AION Entities also argue that this action violates New York's anti-champerty statute.
I. Failure to State a Claim
A. Piercing the Corporate Veil (First Cause of Action) is Dismissed as a Separate Cause of Action
With respect to the first cause of action for piercing the corporate veil, the AION Entities argue that New York does not recognize a separate cause of action to pierce the corporate veil (citing Chiomenti Studio Legale, LLC v Prodos Capital Mgmt. LLC (140 AD3d 635 [1st Dept 2016]; Shugrue v Stahl (117 AD3d 527 [1st Dept 2014]). Although the AION Entities are correct that piercing the corporate veil is not a separate cause of action under New York law, the right to pierce the corporate veil is "established when the facts and circumstances compel a court to impose the corporate obligation on its owners, who are otherwise shielded from liability" (Tap Holdings, LLC v Orix Fin. Corp., 109 AD3d 167, 174 [1st Dept 2013]). Accordingly, while the specific cause of action for piercing the corporate veil must be dismissed, the AION Entities may still be liable for the fraudulent conveyance causes of action (see Chiomenti Studio Legale, LLC v Prodos Capital Mgmt. LLC, 2015 WL 1095700, *5 [Sup Ct NY Cnty 2015] [explaining that while piercing the corporate veil is not an independent cause of action, defendant may be liable under the other asserted causes of action] [affd, 140 AD3d 635 (1st Dept 2016)]).
B. The Complaint States a Claim for Actual Fraudulent Conveyance (Second Cause of Action
To state a claim for fraudulent conveyance under NY Debtor & Creditor Law § 276, a plaintiff must allege that (1) a transfer was made (2) with the actual intent to hinder, delay or defraud either present or future creditors (NY Debt & Cred § 276). The New York statute on fraudulent conveyances is interpreted broadly, defining a conveyance as "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance" (id., § 270). Claims alleging fraudulent conveyance are subject to CPLR 3016(b)'s heightened pleading standard (Carlyle, LLC v Quik Park 1633 Garage LLC, 160 AD3d 476 [1st Dept 2018] [dismissing fraudulent conveyance claim where fraudulent intent was not alleged with sufficient particularity but upon information and belief only]). 
Here, the AION Entities contend that this claim fails because Acacia does not identify with particularity the transfers which are alleged to be fraudulent and because the Complaint [*4]engages in group pleading rather than alleging "exactly which defendant engaged in what activity and when, in furtherance of the alleged fraud" (citing 3 E. 54th St. NY, LLC v Patriarch Partners, LLC, 90 AD3d 418, 419 [1st Dept 2011]). This argument, however, fails. Among other things, the Complaint alleges that all of the following were done for no consideration: (i) the transfer of contracts from DCD to the AION Entities, including a property management contract from a DCD affiliate to "AION Realty LLC, a wholly-owned subsidiary of AION Holdings, Inc, an affiliate"), (ii) the transfer of over $5 million from DCD by the end of 2012, (iii) the transfer of properties from DCD's portfolio to AION Partners' portfolio, (iv) the transfer of DCD's contractual right to fee from a DCD project to AION Partners, (v) the transfer of "asset management responsibilities" from DCD's subsidiary to AION Partners, (vi) the transfer of all assets to the AION Entities, and Messrs. Randeree and/or Dadabhoy, and (vii) a DCD subsidiary changing its name to "AION." (Compl., ¶¶ 59-64, 72-75, 121, 126). Although the AION Entities allege that Acacia improperly engages in group pleading, Acacia sufficiently sets forth the specific transfers, their approximate dates of transfers and the transferors/transferees. As the Court of Appeals made clear in Pludeman v North Leasing Sys., Inc., "section 3016(b) may be met when the facts are sufficient to permit a reasonable inference of the alleged conduct" (10 NY3d 486, 492 [2008]). The Court explained:
 we have never required talismanic, unbending allegations. Simply put, sometimes such facts are unavailable prior to discovery. Lest we willfully ignore the obvious — or the strong suspicion of a fraud — we have always acknowledged that, in certain cases, less than plainly observable facts may be supplemented by the circumstances surrounding the alleged fraud.
(id.).
As has been observed by other courts, "[d]irect evidence of fraud is often elusive" at the pleading stage (Pen Pak Corp. v LaSalle Nat. Bank of Chicago, 240 AD2d 384, 386 [2d Dept 1997). For purposes of this motion to dismiss, the complaint here sufficiently alleges the transactions complained of so as to give them proper notice of the claims against them.
Next, the AION Entities argue that even if Acacia has alleged an actual transaction, its claim fails because it does not allege the requisite fraudulent intent. The Court of Appeals has stated that the intent to commit fraud is to be divined from the surrounding circumstances (Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553 [2009]; Oster v Kirschner, 77 AD3d 51, 56 [1st Dept 2010]). The AION Entities claim that there can be no fraudulent intent here as a matter of law because the dissolution of DCD and the transfer of its assets to the AION Entities was done completely out in the open. To wit, AION Partners publicly announced its existence and relationship with DCD in 2009  seven years before TAIB obtained its judgments, two years before the TAIB Action was commenced, and approximately a year before the default notice was even issued, and per the complaint, DCD's operations were also slowly wound down over a three-year period, there are no allegations that any of the AION Entities are shell corporations or not actually conducting legitimate business, the 2009 formation of AION Partners and its role with certain DCD properties was publicized in press releases and news articles, and Mr. Betancourt told TAIB in 2010 that "AION Partners LLC ha[d] assumed asset management responsibilities from West End Sponsor, LLC by assignment" (Compl., ¶¶ 55, 36, 66-67). In short, the AION Entities maintain that, by Acacia's own account, all of this was done out in the open and, therefore, Acacia's allegations establish "the opposite of fraudulent intent" [*5](AION Entities Supp. Memo., p. 12). The argument, however, also fails.
Although many of the underlying actions took place as early as 2009, before the TAIB Action was ever commenced, Acacia alleges sufficient additional facts to survive a motion to dismiss. Among other things, the Loan's maturity date was allegedly extended to 2011 in 2009, which Acacia claims lulled TAIB into not pursuing its rights while DCD siphoned away its assets (Acacia Opp. Memo., Seq. 002, p. 13, citing O'Donnell Aff., Exs. 9-10). Moreover, the Complaint sufficiently alleges that DCD purposefully failed to retain records and otherwise obstructed or evaded TAIB and/or Acacia's efforts at obtaining discovery, both pre and post judgment. The AION Entities cannot have it both ways: they cannot fail to retain records and produce evidence in response to information subpoenas and then also criticize Acacia for lacking sufficient details regarding same (Pludeman, supra, 10 NY3d at 491 [denying motion to dismiss "where concrete facts 'are peculiarly within the knowledge of the party' charged with the fraud"). This conclusion is bolstered by the timing of the alleged transfers, which were made at least in part while TAIB was pursuing DCD on its Loan, and which further underscores the necessity for DCD to have retained its financial records as to its transfers at the time of its dissolution (Miller v Miller, 276 AD2d 758 [2d Dept 2000]; Grumman Aerospace Corp. v Rice, 199 AD2d 365, 367 [2d Dept 1993]). And, although the creation of AION may have been made public, the transfers for what Acacia alleges to be zero consideration were not. Accordingly, the motion to dismiss the second cause of action for failure to state a claim is denied.
C. The Complaint States a Claim for Constructive Fraudulent Conveyance (Third Cause of Action)
Acacia also maintains that the Complaint fails to state a claim for constructive fraudulent conveyance (the third cause of action). To state such a claim under NY Debtor & Creditor Law § 273, a plaintiff must allege that: (1) a transfer was made without fair consideration, and (2) the transfer rendered the conveyor insolvent (NY Debt & Cred § 273). Alternatively, under § 273-a a plaintiff must allege that: (1) a transfer was made without fair consideration, (2) at the time of transfer, the conveyor was a defendant in an action for money damages or had a judgment in such an action docketed against him; and (3) a final judgment has been rendered against the conveyor that remains unsatisfied (NY Debt & Cred § 273-a). Fair consideration is defined as: (i) "[w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied," or (ii) "[w]hen such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained" (NY Debt & Cred § 272). 
Unlike claims under NY Debtor & Creditor Law § 276, the transferor's actual intent is irrelevant under § 273. A person/entity is considered insolvent when "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured" (NY Debt & Cred §271[1]). The AION Entities do not dispute that DCD became insolvent. As referenced in the Complaint, the tax returns are clear that DCD had over $5,000,000 in assets in 2010/2011 while liable on a potential $10,000,000 guaranty to TAIB. Thus, the only question is whether the conveyances from DCD to the AION Entities were made for fair consideration. This is not a question that can be determined on the facts here at the pleading stage. For purposes of this motion, it is sufficient [*6]that Acacia alleges that the AION Entities paid no consideration for DCD's assets and the AION Entities have not put forth any evidence to the contrary. The motion to dismiss the third cause of action for failure to state a claim, therefore, must be denied at this stage of the proceeding.
D. The Complaint Fails to State a Claim for an Accounting (Fifth Cause of Action)
With respect to the accounting claim (the fifth cause of action), the AION Entities argue that this claim fails as there is no fiduciary relationship between the parties as required for an accounting cause of action. Generally, "[t]he right to an accounting rests on the existence of a trust or fiduciary relationship regarding the subject matter of the controversy at issue" (DiTolla v Doral Dental IPA of NY, LLC, 100 AD3d 586, 587 [2d Dept 2012]). Although Acacia may be entitled to certain financial information regarding DCD's dissolution and the AION Entities' assets, it is not entitled to an accounting simply as a judgment creditor. Accordingly, this claim is dismissed.
II. The Statute of Limitations Does Not Bar Recovery
The statute of limitations for fraudulent conveyance claims is the later of (1) six years from the alleged fraudulent conveyance or (2) years from inquiry notice of the alleged fraudulent conveyance (CPLR 213; CPLR 203[g]; Avalon LLC v Coronet Props. Co., 306 AD2d 62 [1st Dept 2003]). The instant complaint was filed on December 14, 2018. The AION defendants argue that the claims therein are untimely because DCD began winding up its operations in 2009, AION Partners was created in 2009, and Mr. Betancourt told TAIB in 2010 that AION had assumed asset management responsibilities. However, as Acacia points out, DCD did not actually dissolve until December 31, 2012, less than six years before the filing of the Complaint and Acacia alleges fraudulent transactions occurred as a result of this dissolution process (e.g., Compl., ¶¶ 47, 49). In addition, Acacia alleges that it did not discover many (if not all) of the fraudulent transfers at issue until 2018 when it finally obtained financial documents from DCD and deposed Messrs. Betancourt, Hasan and Khan. Although the AION Entities argue that Acacia had "inquiry notice" of the fraudulent transfers, the facts they reference suggest only that another company (AION) was created and becoming involved in DCD's business. It is simply not sufficient without more to give inquiry notice of transfers without consideration to Acacia (or its predecessor in interest, TAIB) justifying dismissal at this stage of the proceeding, particularly in light of the State Court Defendants' total denial that they transferred any significant assets as late as March 2017, as discussed above (3/17/17 Responses, O'Donnell Aff., Ex. 5, No. 12, NYSCEF Doc. No. 74). Put another way, on this motion and at this stage of the proceedings, the court accepts Acacia's account that it was not until tax returns and balance sheets were produced in 2018 that it became evident that the State Court Defendants' denials were false (see McGuinness v Standard Drywall Corp., 193 AD2d 518, 518 [1st Dept 1993] [("Although the alleged fraudulent transfers commenced in 1983 and the action was not brought until 1990, after investigations in connection with attempts to satisfy the judgments, plaintiffs utilized reasonable diligence in discovering the transfers, which transfers were peculiarly within the knowledge of defendants, and the failure of plaintiffs to ascertain the truth by inspecting public records is not determinative"]). Certainly, it cannot be said here that Acacia/TAIB sat on its hands here rather than pursue its rights, both in the underlying TAIB Action and in its efforts to collect the judgment. For the avoidance of doubt, the statute of limitations may be raised at a [*7]later point, but on the record before the court, dismissal on this record at this stage would not be appropriate.
III. The Prohibition on Champerty Does Not Prohibit Recovery
"The doctrine of champerty developed 'to prevent or curtail the commercialization of or trading in litigation'" (Trust for Certificate Holders of Merrill Lynch Mtge. Invs. v Love Funding Corp., 13 NY3d 190, 198 [2009] [citation omitted]). However, New York cases are clear that,"if a party acquires a debt instrument for the purpose of enforcing it, that is not champerty simply because the party intends to do so by litigation" (id. at 200). Accordingly, champerty does not prevent recovery here.
Motion Seq. 003
I. The Complaint is Dismissed Against Mr. Betancourt Inasmuch as the Director Liability Claim (Fourth Cause of Action) is Dismissed Against the Individual Defendants Without Prejudice
Mr. Betancourt's motion (seq. no. 003) is directed solely at the fourth cause of action for director liability as that is the only claim that is asserted against him directly. This claim is also asserted against Messrs. Dadabhoy and Randeree and is subject to Messrs. Dadabhoy and Randeree's motion to dismiss (seq. no. 004). As the arguments made by all the individual defendants with respect to this claim are substantially identical, the court will address the claim as to all the individual defendants here.
With respect to the fourth cause of action, Acacia alleges that, "[a]s directors of DCD, [Mssrs.] Dadabhoy, Randeree and Betancourt had a duty to DCD's creditors, including TAIB/Acacia, to not siphon DCD's assets to its shareholders before dissolution and to retain records during the [TAIB] litigation" and that the individual defendants breached these duties (Compl., ¶¶ 144-45). New York courts generally apply the internal affairs doctrine to claims that are based on the "duties and obligations of directors," and hold that such claims are governed by the substantive law of the state of incorporation — i.e., in this case, Delaware (Diamond v Oreamuno, 24 NY2d 494, 503-04 [1969]).
In support of dismissal, the individual defendants rely on North Am. Catholic Edu. Programming Foundation, Inc. v Gheewalla, in which the Supreme Court of Delaware rejected a directbreach of fiduciary duty claim by the creditors of corporation in the "zone of insolvency" or otherwise insolvent (930 A2d 92 [DE 2007]). In Gheewalla, a creditor alleged claims for breach of fiduciary duty against three individual directors of a company that had become insolvent. The Supreme Court of Delaware held that individual creditors of an insolvent corporation could assert a derivative claim against the corporate directors for breach of fiduciary duties owed to the corporation, but had no right to assert such claims directly. The court explained:
It is well settled that directors owe fiduciary duties to the corporation. When a corporation is solvent, those duties may be enforced by its shareholders, who have standing to bring derivativeactions on behalf of the corporation because they are the ultimate beneficiaries [*8]of the corporation's growth and increased value. When a corporation is insolvent, however, its creditors take the place of the shareholders as the residual beneficiaries in any increase in value.
Consequently, the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties. The corporation's insolvency makes creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value. Therefore, equitable considerations give creditors standing to pursue derivative claims against the directors of an insolvent corporation. Individual creditors of an insolvent corporation have the same incentive to pursue valid derivative claims on its behalf that shareholders have when the corporation is solvent.
(Gheewalla, 930 A2d at 101-02 [quotation and citation omitted] [emphasis in original]). 
The court explained that to find otherwise and recognize that "directors of an insolvent corporation owe directfiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation," and would "create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors" (id. at 103 [emphasis added]). After all, creditors are already protected by "strong covenants, liens on assets, and other negotiated contractual protections," as well as the implied covenant of good faith and fair dealing, and, as significant here, by "the law of fraudulent conveyance" (id. at 100, quoting Production Resources Group L.L. v NCT Group, Inc., 863 A2d 772, 790 [Del Ch 2004] [emphasis added]).
To the extent that Acacia argues that a distinction should be made here because DCD was actually dissolved, and not insolvent, Acacia does not cite any case law in support of such a distinction. Rather, it relies on Del. Code Ann. Tit. 8, §§ 280 and 281 to argue that because notice was not provided, direct claims by the creditors against the directors must be permitted. The argument however inappropriately conflates two different issues: immunity and standing.
Del. Code Ann. Tit. 8, §§ 280 and 281 provide a process by which dissolving corporations may wind up their affairs and provide notice to creditors and potential creditors of the pending dissolution to allow creditors to make claims and to establish a "safe harbor" for directors who comply with these statutory provisions. Directors who elect to follow the requirements set forth in the statute are entitled to safe harbor protection against suit (In re RegO Co., 623 A2d 92 [Del Ch 1991] [discussing purpose of the "innovative" provisions of §§ 280-282]). To wit, as the Delaware chancery court explained in In re RegO, §§ 280-282 were enacted to address the scope of director and shareholder liability for corporate obligations following a corporation's dissolution. That court noted that:
At an early stage of our law, that law was clear, if harsh. Dissolution of a corporation was its civil death; not only could the corporation not thereafter be sued, but pending suits against it abated. Corporate dissolution thus stood as a substantial risk to corporate creditors, threatening to deprive them of a party to sue on their claims.
(id., 623 A2d at 95).
To address this issue, courts created the trust fund doctrine, in part, to offer some [*9]protection to corporate creditors when dissolution occurred (id.). Among the "core concepts" of the trust fund doctrine is that "on dissolution corporate directors have obligations to creditors and that creditors, at least creditors of whom the corporation had reason to know, have an equitable right to follow corporate assets and to impress a constructive trust upon them in the hands of shareholders" (id.). Now, however, there is a "formal winding-up period in which claims can be asserted, settled or adjudicated," and any pending suit against a corporation that is filed before or during the wind-up period does not abate even on expiration of the wind-up period (id., citing Del. Code Ann. Tit. 8, § 278). Sections 280 through 282 of the Delaware General Corporation Law, in turn, (i) structure alternative mechanisms which, under certain circumstances, recognize "rights in unknown future corporate claimants and provide a level of assurance to such persons that, as part of the corporate dissolution process, reasonable provision will be made for their future claims," and (ii) — significant here — offer "directors and shareholders (and perhaps transferees) assurance that, if the Court of Chancery approves security provisions [set forth in those statutes] for corporate claimants, then they will be protected from potential future claims arising from the decision to distribute the corporation's assets on dissolution" (id. at 96-97).
In other words, §§ 280 and 281 provide a mechanism through which the directors could elect to proceed to potentially protect themselves from "future claims arising from the decision to distribute the corporation's assets on dissolution. (id. at 97 [noting that compliance with these sections "will, in principal at least, always be litigable"]. Importantly, however, and contrary to Acacia's contention, the failure to comply with §§ 280 and 281 simply does not create a basis for liability or otherwise confer standing. That is simply not something the statutes address. Ghewalla, on the other hand, addressed the standing issue head on and held that only derivative claims may be asserted by creditors of a corporation in the "zone of insolvency" or otherwise insolvent for breach of fiduciary duty.
Nor is a different result compelled by Section 720 of New York's Business Corporation Law, which simply provides that:
An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief to compel the defendant to account for his official conduct in the following cases: [t]he acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.
(NY BCL 720[a]).
Section 720 is procedural in nature and simply has no bearing to the issue. In contrast, "matters peculiar to the relationships among or between" the corporation and its officers and directors are "governed by the substantive law of the state or country of incorporation" (New Greenwich Litigation Trustee, LLC v Citco Fund Servs. (Europe) B.V., 145 AD3d 16 [1st Dept 2016] [emphasis added] [citing Edgar v MITE Corp., 457 US 624, 645 [1982] and Culligan Soft Water v Clayton Dubilier & Rice LLC, 118 AD3d 422 [1st Dept 2014]). Here, the substantive law to be applied is that of Delaware. To hold otherwise would impermissibly subject DCD to conflicting demands because "only one State should have the authority to regulate a corporation's internal affairs" (Edgar, 457 US at 645). And, under Delaware law (Gheewalla), there simply cannot be a direct claim for breach of fiduciary duty by a creditor in this action. [*10]Accordingly, the fourth cause of action is dismissed against all the individual defendants without prejudice.
Motion Seq. 004
Mssrs. Dadabhoy and Randeree move to dismiss all five claims asserted against them. 
I. The Fact that Mr. Randeree Resigned from DCD in 2010 is Insufficient to Dismiss the Complaint as Against Him
As an initial matter, Mr. Randeree argues that the claims against him must be denied because he resigned as a director of DCD In 2010. In support of this claim, Mr. Randeree submits a resignation letter (the Resignation Letter) dated June 16, 2010, which states:
Please accept this letter as my formal resignation from the position of Officer and Director of DCD Americas, Inc. As of the date herein, I will no longer be an Officer or Director of DCD America, Inc. including subsidiaries and affiliates.
(NYSCEF Doc. No. 58).
Mr. Randeree also attests in a brief, seven-paragraph affidavit that:
4. The Complaint asserts claims against me based on the allegation that I am a principal and director of the defendant DCD America, Inc. ("DCD America") [].
5. However, I never had any equity interest in DCD America.
6. Further, I resigned from the position of Officer and Director of DCD America on June 16, 2010. []
7. DCD America's Board of Directors accepted my resignation on September 30, 2010.
(NYSCEF Doc. No. 61).
The September 30, 2010 Board Minutes (the Board Minutes) for DCD — while submitted in heavily redacted form — also indicate that "the Board accepts the resignation of Shabir Randeree as the Officer and Director of DCD America Inc. and all subsidiaries and put on record the valuable contribution made by him during the term of his office." Mr. Randeree does not state in his affidavit whether he has or had any affiliation with any of the AION Entities following his resignation as a Director of DCD. The affidavit is silent as to anything he did subsequent to submitting his Resignation Letter.
In opposition, Acacia submits portions of Mr. Betancourt's testimony from April 18, 2018, wherein Mr. Betancourt testified: (i) that Messrs. Dadabhoy and Randeree both own AION Realty, (ii) that, to the best of his knowledge, the owners of DCD America were Messrs. Dadabhoy and Randeree, and (iii) the owners of "AION" were also Messrs. Dadabhoy and Randeree (NYSCEF Doc. No. 98, pp. 14:22-24; 62:9-15). 
Based on the foregoing, Mr. Randeree's role in DCD and the AION Entities is, at minimum, clearly disputed. At this stage of the proceedings, the court declines to dismiss Mr. Randeree from these proceedings on the basis of the Resignation Letter, his very sparse affidavit and the heavily redacted Board Minutes given that another member of the AION Entities and [*11]DCD has testified that Mr. Randeree is and was involved with both.
II. The Complaint Fails to State Claims Against Mssrs. Dadabhoy and Randeree Individually
Turning to the remainder of Messrs. Dadabhoy and Randeree's arguments in favor of dismissal, there is simply an insufficient basis here, at this point, to hold these individuals personally liable on the fraudulent transfer claims. Under Delaware law, which, as discussed above, applies here because DCD is a Delaware corporation, a corporate veil can be pierced to hold individual directors liable for the obligations of the corporation only if the corporation is a "sham and exist[s] for no other purpose than as a vehicle for fraud" (Wallace v Wood, 752 A2d 1175, 1184 [Del Ch 1999]). The corporate veil generally cannot be pierced where a company "is engaged in substantial business operations and was formed for purposes relating to the pursuit of normal business operations" (In re Sunstates Corp. Shareholder Litig., 788 A2d 530, 534 [Del Ch 2001]). To allege a claim against the individual officers and/or directors of a Delaware corporation, Acacia must allege facts that, if taken as true, demonstrate the officers' and directors' complete domination of the company such that the company no longer has legal or independent significance of its own (see Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v Wood, 752 A2d 1175 [Del Ch 1999]). The Complaint does not do so here with respect to the Messrs. Dadabhoy and Randeree. Piercing the corporate veil requires that the corporate structure be such that it causes fraud or similar injustice (id. at 1184). The Complaint alleges sufficient allegations of such fraud and injustice with respect to DCD and the AION Entities (e.g., same offices, same employees, same phone and fax numbers, same management contracts, etc.), but contains insufficient allegations of such alleged fraud with respect to Messrs. Dadabhoy and Randeree. Critically, the Complaint does not contain sufficient allegations of the Messrs. Dadabhoy and Randeree's complete domination and control over the corporate entities or that the corporate formalities with respect to the corporate entities and these defendants were not observed. Therefore, Acacia has failed to meet its heavy burden of showing that the corporation was dominated byMessrs. Dadabhoy and Randeree (as opposed to its showing that the AION Entities dominated DCD) for the purpose of holding the Messrs. Dadabhoy and Randeree personally liable with respect to the transactions attacked (see Do Gooder Prods., Inc. v American Jewish Theatre, Inc., 66 AD3d 527, 528 [1st Dept 2009]). Therefore, the claims against them are dismissed without prejudice.
Accordingly, it is
ORDERED that motion seq. no. 002 is granted to extent of dismissing the first (piercing the corporate veil) and fifth (accounting) causes of action in the complaint, the Clerk is directed to enter judgment accordingly and the moving defendants are directed to file an Answer to the Complaint within 20 days of this decision and order; and it is further
ORDERED that motion seq. no. 003 is granted and the complaint is dismissed, without prejudice, as against Michael Betancourt; and it is further
ORDERED that motion seq. no. 004 is granted and the complaint is dismissed, without prejudice, as against Messrs. Dadabhoy and Randeree; and it is further
ORDERED that the Clerk is directed to amend the caption accordingly, upon service on him of a copy of this decision by the defendants, together with notice of entry.
[*12]DATE February 18, 2020
ANDREW BORROK, J.S.C.